James T. Benn v. Commissioner.
Benn v. Commissioner
Docket No. 78019.
United States Tax Court
T.C. Memo 1963-151; 1963 Tax Ct. Memo LEXIS 192; 22 T.C.M. (CCH) 707; T.C.M. (RIA) 63151; May 31, 1963
Benj. H. Saunders, Shoreham Bldg., Washington, D.C., Fuller Holloway, and Glenn L. Archer, Jr., for the petitioner. Donald W. Geerhart and S. A. Winborne, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies and additions to tax in petitioner's Federal income tax in the amounts and for the years as follows: Additions to Tax
293(b), 1939 Code
291(a)
294(d), 1939 Code
Year
Deficiency
6653(b), 1954 Code
1939 Code
6654, 1954 Code
1951
$ 17,064.98
$ 8,532.49
1952
6,905.00
3,452.50
1953
17,451.66
8,725.83
$4,362.92
$2,779.32
1954
25,156.50
12,578.25
4,007.75
1955
189,879.66
94,939.83
151.34
*193 In each of the years in issue respondent determined that petitioner realized taxable income from his business or profession, and business income was accordingly increased. Other determinations include the following: For the year 1951 respondent disallowed a capital loss carryover from 1950 which petitioner reported on his 1951 return, and amounts reported by petitioner as shortterm capital gain were treated as ordinary income. For the year 1952 respondent disallowed a deduction claimed for a worthless bad debt. For the year 1955 respondent determined that long-term capital gain reported by petitioner constituted ordinary income, and that petitioner did not sustain a loss from his business or profession as reported on his return. Respondent further determined that the deficiencies in income tax for each of the years in issue were due in whole or in part to fraud with intent to evade income taxes, and respondent asserted the 50 percent addition to tax pursuant to section 293(b) of the Internal Revenue Code of 1939 for the years 1951, 1952, and 1953, and section 6653(b) of the Internal Revenue Code of 1954 for the years 1954 and 1955. Additions to tax were asserted *194 for the years 1953 and 1954 pursuant to section 294(d) of the Internal Revenue Code of 1939 for failure to file declarations of estimated tax for these years, and an addition to tax for underpayment of estimated tax was asserted for the year 1955 pursuant to section 6654(a) of the Internal Revenue Code of 1954. An addition to tax for failure to file a return for the year 1953 was asserted pursuant to section 291(a) of the Internal Revenue Code of 1939. The issues for our decision are: (1) The amount, if any, of the taxable income realized by the petitioner during the years 1951 through 1955, and whether all of such income, as respondent determined, constitutes ordinary income; (2) whether all or any part of any deficiencies so found were due to fraud with intent to evade the payment of taxes; (3) whether the statute of limitations bars assessment and collection of taxes for the years 1951 and 1952; (4) whether petitioner is liable for the addition to tax for failure to file a return for the year 1953; (5) whether petitioner is liable for additions to tax for the years 1953 and 1954 for failure to file declarations of estimated tax; and whether petitioner *195 is liable for an addition to tax for underpayment of estimated tax for the year 1955. On brief respondent concedes that the additions to tax asserted under section 294(d)(2) for the years 1953 and 1954 are inapplicable. Because petitioner claimed a capital loss carryover on his Federal income tax return for the year 1951 in the amount of $15,937, arising from a transaction which terminated in 1950, it will also be necessary to make specific findings as to various transactions which occurred in 1949 and 1950. Findings of Fact Some of the facts were stipulated and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein and made a part of our findings by this reference. Petitioner, sometimes hereinafter referred to as Benn, is an individual who lodged for short times at various addresses in or near Miami, Florida, during the greater part of the taxable years involved herein. He had no regular place of abode. His Federal income tax returns for the years 1951, 1952, and 1955 were filed on a cash receipts and disbursements basis with the district director or collector of internal revenue at Jacksonville, Florida. On these returns his address *196 was shown as in care of various attorneys, one in Florida and one in New York. No waivers extending the period of limitations for assessment of income taxes have been executed or filed by petitioner, nor did he file any income tax returns for the taxable years 1953 and 1954. During the period 1949 through 1955 petitioner was primarily engaged in the business of buying and selling properties of all kinds. All of the properties sold by petitioner during the period 1949 through 1955 were held by him for sale to customers in the ordinary course of his business. Benn maintained no books of account and no bank account in his own name. He transacted all his business dealings with cash, notes, or cashier's checks. Many of his transactions were carried on by him through and in the names of "dummy" corporations. Some of his transactions were carried on through and in the name of Margaret I. Bland, his common law wife, whom he later married in a marriage ceremony pursuant to a license on or about July 2, 1957, for the purpose of preventing her from testifying against him. On one occasion he rented a safe deposit box under an assumed name. Whenever tax returns were filed by him they were prepared *197 from figures supplied to his accountant, which were obtained from various papers and receipts which Benn carried about in a briefcase. Petitioner carried on his business transactions in such a way as to conceal his assets from his creditors, including the Internal Revenue Service. Petitioner did not cooperate with respondent's agents until he employed the attorneys who represented him in this proceeding. In August 1948 petitioner through his wholly-owned corporation, Baycrest Investment Corporation, acquired real estate located on Biscayne Boulevard in Miami, Florida, upon which he proposed to erect a 34-unit motel. This motel was built by the Benn Brothers Construction Company during the years 1948 and 1949. Petitioner spent $65,764.40 in the acquisition and construction of this property, most of which money was borrowed by petitioner from a number of people. Most of the borrowed money was repaid, although some of the money repaid was later borrowed by petitioner for other purposes. In addition, Morris Glantz also expended the approximate total amount of $46,125 in the construction and furnishing of the motel and the satisfaction of certain liens against this property. These *198 expenditures were in large part secured by a mortgage from Baycrest and liens against Baycrest's property. Of the money borrowed by petitioner and expended by him in this project, approximately $29,500 was obtained by him from one Florence M. Redelsheimer, sometimes hereinafter referred to as Florence, of Nashville, Tennessee. Of this amount, Florence first loaned petitioner $26,148 on January 31, 1949. This amount represented the net proceeds to her of a $27,000 loan made to her by a Miami bank for which she had pledged as security her own securities having a value of $37,000, including a $5,000 municipal bond which matured during the pendency of the bank loan and which was applied by the bank to the payment of Florence's note, leaving a balance due thereon of $22,000. Florence was the wife of Jonas Redelsheimer until the death of Jonas on September 4, 1951. Although petitioner and Florence knew of this marriage, they entered into a bigamous marriage on July 21, 1949. A child was born to Florence on June 15, 1950. Petitioner filed a suit for divorce from Florence in Florida on March 28, 1951. On June 2, 1951, petitioner, upon arriving in Nashville in the company of Florence's brother, *199 Jacques Miller, was arrested on a lunacy warrant issued on the complaint of Florence. After being held in jail for some hours, petitioner succeeded in being released but made claim to damages from Jacques Miller, which claim will be referred to later in these findings. Petitioner and Florence were remarried on November 28, 1951 (after the death of Jonas), but after about 5 weeks they separated and were later divorced. In order to pay Florence's note to the bank, upon which there was then unpaid the amount of $22,000, petitioner borrowed the sum of $25,000 from Andy Viglianco and his son, doing business through the Code Holding Company, a corporation then wholly owned by the Vigliancos. In return, petitioner gave his note for $27,298.20 payable to Code Holding Company and his note for $2,000 payable to Andy Viglianco, both notes being dated March 4, 1949, and payable May 3, 1949. As security petitioner assigned to the Vigliancos and Code Holding Company 80 percent of the stock of Baycrest. With the proceeds of these notes ($25,000) petitioner paid Florence's bank note, and her securities pledged there were returned to her. At or about this time petitioner caused Baycrest to execute *200 a "fourth mortgage" running to Florence in the sum of $34,151.74, and induced Florence to execute an assignment of this mortgage in blank. Petitioner's note to Code Holding Company was not paid when due, and the Vigliancos satisfied themselves that at that time the stock of Baycrest was without value. After some threats of litigation, Viglianco accepted in September 1949 a new note predated to May 3, 1949, for $27,300 payable to him personally from petitioner in satisfaction of petitioner's prior notes to Viglianco and Code Holding Company. At or about the same time the assignment of the Redelsheimer mortgage for $34,151.74 was delivered to Code Holding Company and its name was typed into the assignment as the assignee. This assignment was recorded on October 11, 1950. In November 1949, after complicated negotiations, an arrangement was agreed upon and completed whereby petitioner and Glantz exchanged all of their interests in and rights to Baycrest and its property to the Vigliancos in return for all of the stock of Code Holding Company, Glantz to receive 50 percent and petitioner 50 percent. It was also agreed that petitioner would pay off and satisfy 75 percent of the liens against *201 Baycrest in excess of security rent payments held by Code Holding from its tenants and the sum of $11,125 expended by Glantz for this purpose. Petitioner did not comply with this agreement. At that time Code Holding Company owned a warehouse in Miami, Florida, which was encumbered by a first mortgage. In December 1949 petitioner and Glantz caused Code Holding Company to sell the warehouse to Max Frank and his wife subject to the first mortgage thereon. In return Glantz received from the Franks an apartment known as Penn Terrace Apartments located in Miami, subject to three mortgages, and petitioner received a note secured by a second mortgage in the amount of $46,125. In 1950 petitioner sold this note and mortgage for $29,188. The Franks also agreed to pay Code Holding Company the net sum of $7,913.84. However, the amount of security rent payments which Code Holding Company was obligated to pay over to the Franks was in excess of $7,913.84, and such excess was paid to the Franks by Glantz. We infer from the record that these security rent payments, which at one time had been held by Code Holding Company, had been expended for the satisfaction of liens against Baycrest before the exchange *202 of Code Holding Company stock for the stock of Baycrest. In September 1950 Viglianco, being about to make a sale of a large part of the Baycrest property, became aware of the fact that Code Holding Company remained the record owner of the Redelsheimer mortgage and obtained an assignment of this mortgage in return for his cancellation of petitioner's note for $27,300 dated May 3, 1949, for which the mortgage had been originally assigned as security. At or about the same time, for reasons unexplained in the record, petitioner and Viglianco exchanged noninterest-bearing notes calling for the payment of $27,300 in 15 years. At or about the same time, petitioner in some way not satisfactorily explained in the record induced Viglianco to execute a note dated September 8, 1950, calling for the payment of $27,300 to petitioner on or before February 18, 1953. This note was executed by Viglianco without consideration, and as to it petitioner has no cost basis. This note will be referred to again in the findings with regard to transactions occurring in 1952. From the transactions involving Baycrest Investment Company and Code Holding Company ending in 1950, petitioner realized the sum of $29,188 *203 on the sale of the second mortgage on the warehouse sold by Code Holding Company and the forgiveness of his indebtedness to Viglianco in the sum of $27,300, or a total of $56,488. Thus his operating loss on these transactions in 1950 amounted to $9,276.40. Petitioner did not file a Federal income tax return for the year 1949, and on his return filed for the year 1950 he reported $550 gross income from "Commissions" but no taxable income and no tax liability. He did not take any specific deductions and did not refer to or otherwise report the assignment of the $46,125 mortgage or the transaction from which it arose. On his return for the year 1951 he claimed a capital loss carryover of $15,937 on his "1950 Sale of Max Frank Mortgage." This amount represents the difference between the principal amount of the mortgage and the $29,188 received by petitioner for its assignment, less $1,000 theoretically deducted in 1950. The sum of $8,726.40 is available to petitioner in 1951 as a net operating loss carryover from 1950. 1951 On his tax return for the year 1951 petitioner reported no taxable income, but certain transactions supposedly resulting in short-term capital gains and losses *204 were reported as follows: Selling Price
Cost
Gain
L. N. Penzi Note
$13,440.04
$12,440.00
$ 1,000.04
50 Robinson Brick
35,000.00
26,100.11
8,899.89
50 Redmon Soil Pipe
63,800.00
42,835.00
20,965.00
2109-11 N.E. 2nd Ave.
55,300.00
75,000.00
(19,700.00) The net result of the foregoing transactions was reported as a short-term capital gain amounting to $11,164.93, which petitioner offset against the alleged capital loss carryover from 1950. Respondent determined that after allowance of a $1,000 standard deduction petitioner had taxable income in the amount of $36,036.33. In a Fourth Amendment to respondent's Second Amended Answer, respondent alleged that petitioner's net taxable income was $52,286.33. The first in a series of transactions affecting petitioner's costs and expenses connected with property sold in 1951 relates to the sale of a note and mortgage of the Robinson Brick Company, hereinafter referred to as the Robinson Brick Company mortgage. On his return for 1951 petitioner showed the cost of his acquisition of "50 Robinson Brick" as $26,100.11. Petitioner derived this figure from the following alleged costs and expenses, of which *205 only the first two items are in dispute: Cost of capital stock of Robinson Brick Company
$11,000.00
Cash advanced by petitioner to Robinson Brick Company
11,829.68
Cash paid by petitioner on behalf of Robinson Brick Company
2,460.43
Unreimbursed travel expense of petitioner between Miami, Florida,
and
Dover, Delaware
500.00
Unreimbursed hotel and long-distance telephone expense incurred
by
petitioner
250.00
Accountant's fee paid by petitioner for services to Robinson
Brick
Company
60.00
Total
$26,100.11
Petitioner purchased all of the stock of the Robinson Brick Company from Morris Glantz on August 25, 1950, for his promissory note in the amount of $11,000 dated August 25, 1950, payable in 1 year. Petitioner paid and satisfied this note on March 26, 1951, by the payment to Glantz of $11,000 in cash. In the early part of 1951 Glantz wrote a letter dated August 28, 1950, at petitioner's request, reciting that he had received $22,000 for the Brick Company stock. This statement was known by Glantz and petitioner to be false, and was written "for effect." Petitioner advanced to Robinson Brick Company the total amount of $11,829.68 during the period *206 of October-December 1950. A large part of this amount (approximately $11,100) was either borrowed directly by petitioner from one Urban Doeber or was advanced by Doeber to the Brick Company on petitioner's behalf and credit. A large part of this indebtedness was evidenced by notes running from petitioner to Doeber. Despite strenuous efforts on the part of Doeber, only $1,150 of petitioner's debt to Doeber has been collected from petitioner. Other items of cost and expense with regard to the Brick Company in the total amount of $3,270.43 have been stipulated. Urban Doeber, although not a stockholder of Robinson Brick Company and not regularly employed by it, acquiesced in petitioner's request that he act as president of the company and as a "favor" to petitioner executed on or about December 14, 1950, without consideration, a mortgage covering the assets of the company securing a bond to petitioner in the amount of $35,000. This mortgage was assigned by petitioner to Redmon Foundry Company on or about February 17, 1951. In August 1950 petitioner joined with Morris Glantz and petitioner's brother, Louis D. Benn, in arranging for the purchase of the assets of a partnership known as *207 Redmon Soil Pipe and Foundry Co., composed of Clarence J. Redmon and his two sons. Clarence J. Redmon acted on behalf of the partnership. The bill of sale ran to Redmon Soil Pipe and Foundry Co., Inc., a corporation organized with the knowledge and consent of petitioner. Petitioner's brother was active in the conduct of that business and advanced money to it for which he was reimbursed by petitioner. As a part of its consideration to the Redmons, Redmon Soil Pipe and Foundry Co., Inc., agreed to assume and pay their outstanding obligations in connection with the business. In January, 1951, petitioner acquired all the stock of Redmon Soil Pipe and Foundry Co., Inc., from Morris Glantz, who was its sole stockholder, for $15,000. On January 10, 1951, petitioner executed and delivered his note in the amount of $10,000 to Clarence J. Redmon and his sons, which amount was the approximate sum of the debts of the Redmons assumed by Redmon Soil Pipe and Foundry Co., Inc. This note was payable on or before June 10, 1952. On March 26, 1951, petitioner paid Clarence J. Redmon on account of this note the sum of $600, and delivered to him petitioner's note for $9,350 (dated March 27, 1951) payable *208 June 1, 1952. Petitioner had no intention of paying this note and so conducted his business as to impede its collection. This note has never been paid by petitioner and no other payments have been made to Clarence J. Redmon, although, when petitioner gave him his note for $9,350. Redmon acknowledged on the face of the $10,000 note the receipt of $9,600 in cash. Petitioner had other specific items of cost and expense in connection with the acquisition of Redmon Soil Pipe and Foundry Co., Inc., as follows: Payment of corporate indebtedness to Louis D. Benn in the amount of $7,100; cost of finished goods inventory in the amount of $1,027; payroll in the amount of $1,275; raw materials purchased in the sum of $2,983; payment of U.S. Social Security taxes in the amount of $2,128.52; Miami Industrial Bank note in the amount of $2,000; attorneys' fees in the amount of $1,700; title insurance in the amount of $275; and state unemployment taxes in the amount of $500. On or about January 19, 1951, the assets of Redmon Soil Pipe and Foundry Co., Inc., were conveyed by petitioner and his brother to Redmon Foundry Industries, Inc., in return for which petitioner received $20,000 in the form of *209 five checks, all drawn payable to his order, plus a promissory note in the principal amount of $40,000, secured by a mortgage on the foundry assets, payable to Redmon Foundry Company, a new corporation formed by petitioner and used by him as a conduit corporation for the purpose of carrying out certain transactions in 1951. On or about February 17, 1951, petitioner assigned the note and mortgage of Redmon Foundry Industries, Inc., and the bond and mortgage of Robinson Brick Company to one Berthold Schultz in return for the conveyance by Schultz to Redmon Foundry Company of real estate known as 2109-2111 N.E. 2nd Avenue, Miami, Florida. Schultz later was forced to foreclose on these mortgages. He obtained the gross amount of $12,500 on the assets covered by the Redmon Foundry Industries, Inc., mortgage. The best offer on the Brick Company assets was $3,500 which he refused, and consequently still holds them. On March 15, 1951, petitioner caused the Redmond Foundry Company to convey to R. W. Burch, Inc., the property known as 2109-2111 N.E. 2nd Avenue, for which he received $52,500 in cash and an automobile with an agreed value of $2,836.40. In 1951 petitioner acquired a one-half *210 interest in the Key West Ice Company from one Andy Viglianco in return for a note to the order of Viglianco in the principal sum of $12,500. Petitioner also paid sums totaling $460 in the acquisition of this property and attorneys' fees in the amount of $500. On or about August 17, 1951, petitioner obtained a release from Viglianco on this note in return for an assignment to Viglianco of an amount of Brazilian Cruzeiros which proved to be nonexistent. On August 20, 1951, petitioner sold one-half of his interest in the Key West Ice Company to one Morris Glantz for $5,000. Petitioner failed to include in his Federal income tax return for 1951 the gain realized on the sale of any interest in the Key West Ice Company, and overstated in such return his costs and expenses with regard to his acquisition of the note and mortgage of the Redmon Foundry Industries, Inc. Petitioner's costs and expenses with respect to the Robinson Brick mortgage were $26,100.11, and his net costs and expenses with respect to the Redmon mortgage were $14,588.52. Taking into account the gain on the sale of the Key West Ice Company in the amount of $4,040, the gain on the sale of 2109-2111 N.E. 2nd Avenue in *211 the amount of $14,647.77, and proceeds of a note reported on petitioner's return and not here in issue in the sum of $1,000.04, and the net operating loss carried over by him from 1950 and available to him as a deduction in the amount of $8,726.40, petitioner's adjusted gross income for the year 1951 was $10,961.41. Petitioner's resultant failure to correctly report his income on his return for that year was fraudulent. Petitioner's return for 1951 was false and fraudulent with intent to evade tax. A part of the deficiency for this year, to be computed under Rule 50, is due to fraud with intent to evade tax. 1952 Petitioner's Federal income tax return for the year 1952 was prepared by his accountant based upon information furnished by petitioner. The return showed no taxable income and on schedule D of the return petitioner reported only the following: Non Business Bad Debt Loss
Promissory note of Baycrest,
Inc., dated 9/26/49 for $27,200.00
Sold June 15, 1952 for net of
$9,000.00 loss of
$18,200.00
Unused capital loss carry-over
from preceding taxable year
4,772.07
Sum of short-term losses
$22,972.07
In the notice of deficiency respondent determined *212 and in his second amended answer he alleged that petitioner realized and had unreported adjusted gross income for the year 1952 amounting to $19,400. On brief the respondent reduces this amount to $17,000. Respondent contends that petitioner's income and expenses for 1952 are as follows: Sale of Viglianco note to Alicia Car-
vell
$ 5,000
Sale of Carvell note to Morris Glantz
4,000
From Glantz for assignment of Mil-
ler claim
3,000
From Carvell for Carvell note
3,500
From Carvell for assignment of Key
West lease
2,000
$17,500
Less attorney's fees
500
Adjusted gross income
$17,000 The first two items totaling $9,000 were reported in schedule D of petitioner's return with respect to the alleged loss on a note of Baycrest, Inc., in the principal amount of $27,200. Baycrest, Inc., or its owners, did not at any time issue a promissory note in the amount of $27,200 to petitioner or any other payee. Benn testified that the $27,200 note referred to in his return was the $27,300 note alleged to have been executed by Viglianco dated September 18, 1950, and payable to Benn on or before February 18, 1953, which we have heretofore considered in these findings, *213 and which we have found was executed by Viglianco without consideration and as to which Benn had no basis. Benn further testified that, hearing that Viglianco was about to visit relatives in Italy or South America, he attempted to collect on this note from Viglianco and accepted from Viglianco the latter's note for $13,600, payable in 10 days, dated May 26, 1952, in payment and satisfaction of the September 18, 1950, note for $27,300. Viglianco testified in effect as follows: On or before May 26, 1952, Benn paid a sum in the approximate amount of $30 to a lawyer, which Benn contended that Viglianco should have paid. Viglianco agreed to sign a note payable in that amount to Benn. On or about May 26, 1952, Viglianco and his wife were having marital difficulties and at Viglianco's request Benn intervened to effect a reconciliation. He drove Viglianco to Glantz's residence where a lawyer was called in to reduce to writing an agreement between Viglianco and his wife, who was not present. Benn paid the lawyer $30 on behalf of Viglianco and suggested that Viglianco execute a note to his order in the sum of $30. Benn then produced a printed note form and wrote the numeral "30" and the word *214 "Thirty" on the note and Viglianco signed it. Viglianco urged Benn to complete the note, whereupon Benn tore up a similar note form and threw it into the toilet which he then flushed. Viglianco retrieved the pieces of the note, however, and he found that the note Benn had torn up was not the one he had signed. Thereafter Benn altered the "30" to read "13,600.00" by writing in the number "1" and adding a stroke to the "0" and two zeros. "Thirty" was changed or completed to read "Thirtheen", the misspelling being that of petitioner. Benn made the note payable to himself as payee 10 days from May 26, 1952, with interest at 6 percent. The testimony of Viglianco was in general corroborated by Glantz, who also testified that the note was filled out with a pen belonging to Glantz, that within a week after Viglianco signed the note Benn telephoned Glantz from New York asking him to send the pen to the New York office of an attorney named Silver, that Glantz complied with this request, and the pen has never been returned. Regardless of whether we accept Benn's version of the origin of the $13,600 note or the version of Viglianco and Glantz, Benn's basis with regard to this note was not *215 in excess of $30. On or about June 2, 1952, a few days before the alleged $13,600 Viglianco note matured, Benn sold it to a Miami real estate agent named Alicia Carvell, sometimes hereinafter referred to as Alicia, for $5,000 and her promissory note, dated June 3, 1952, in the amount of $5,000 due 80 days thereafter. Benn sold Alicia's $5,000 note to Glantz for $4,000 on June 10, 1952. On or about August 20, 1952, Benn assigned a pending claim for damages for false arrest against Florence's brother, Jacques Miller, to Glantz in exchange for the return of Alicia's note and $3,000 in interest due on certain Marathon Gas Co. notes held by Glantz and subsequently collected by petitioner. Benn agreed to reimburse $8,000 to Glantz if Glantz failed to realize $12,000 on this claim against Jacques. In a subsequent year but prior to September 8, 1954, Benn decided to and did cease his prosecution of his legal action against Miller. On September 8, 1954, this $8,000 was repaid to Glantz. On or about June 25, 1952, Benn assigned to Alicia a lease on some lots located in Key West, subject to a unilateral option to repurchase the lease at any time prior to January 1, 1955. Benn spent about *216 $600 to acquire this lease and Alicia paid him $2,000 for it. Sometime in 1952 Benn procured the lease from Alicia and as of the date of the trial he had not returned it, but on or about August 22, 1952, he offered to return Alicia's $5,000 note to her at a discount. Alicia paid Benn $3,500 in the form of a cashier's check and Benn returned the note to her. Respondent acknowledged in his second amended answer that petitioner spent $500 during the year 1952 for attorney's fees in connection with the foregoing transactions. Benn also paid the amount of $350 to Alicia in connection with his reacquisition of the lease. Petitioner's total receipts for the year 1952 amounted to $17,500. The costs and expenses connected with these receipts consisted of the $600 spent to acquire the Key West lease assigned to Alicia, $350 paid to Alicia when she returned the lease to him, and the $500 attorney's fees paid by Benn. Petitioner's adjusted gross income for the year 1952 amounted to $16,020. Petitioner's failure to correctly report his income on his 1952 return was due to fraud with intent to evade payment of Federal income taxes. Petitioner's return for 1952 was false and fraudulent with intent *217 to evade tax. 1953 Petitioner received net proceeds of $35,017.40 on April 28, 1953, upon the sale of an apartment building. During the year 1953 petitioner also realized rental income in the amount of $1,100. The dispute between the parties for this year is whether petitioner incurred any costs and expenses with respect to these transactions. On December 18, 1952, Florence Redelsheimer, whose relations with Benn have been already referred to, conveyed to Benn an apartment building located in Nashville, Tennessee, and known as the Stonesthrow. On December 22, 1952, Benn conveyed the property back to Florence. Both deeds were recorded. On February 25, 1953, Florence executed and delivered deeds again conveying Stonesthrow and another piece of Nashville property, known as the Donelson Tract, to Benn. These deeds were not recorded. As consideration therefor Benn gave Florence a promissory note dated February 25, 1953, in the principal amount of $37,500. Benn subsequently rendered this note nonnegotiable by deleting the words "the order of" and by adding the words "Subject to any claim or offsets by the payor against the payee" on the back of the note. Benn never made any payments *218 to Florence on the $37,500 promissory note and never intended to do so. During 1953, as in all other years before us, Benn so conducted his affairs as to make impossible for all practical purposes the collection of any judgment that might be obtained against him. On April 17, 1953, Florence executed another deed conveying Stonesthrow to Benn. This deed was recorded. Thereafter, on April 28, 1953, Benn sold Stonesthrow to Percie W. Lea and W. T. Mallison, receiving as consideration therefor net proceeds amounting to $35,017.40 which was paid to him in the form of a check drawn to his order. Florence subsequently instituted legal action in the Tennessee courts to recover the Donelson Tract and Stonesthrow, and although she was successful in recovering the Donelson Tract, she could not establish a valid claim to Stonesthrow. On or about September 10, 1953, Universal Investors Co., Inc., of which Benn was vice president, leased certain acreage to Consolidated Ranch Corp., which issued its check to Universal in the amount of $1,500. This check was deposited in an account belonging to Herbert L. Blume, hereinafter sometimes referred to as Blume, as trustee. Thereafter, on or about *219 September 30, 1953, Blume drew a check on this account payable to petitioner's order in the amount of $1,100. Petitioner incurred deductible legal expenses in the amount of $525.24 in the year 1953. Petitioner's total receipts for the year 1953 amounted to $36,117.40. The costs and expenses incident thereto amounted to $525.24. His adjusted gross income for the year 1953 amounted to $35,592.16. Petitioner did not file a Federal income tax return for the year 1953, nor did he file declarations of or make payments toward his estimated tax for that year. Petitioner told his accountant Hall that he had paid for Stonesthrow with money borrowed from Florence and that the proceeds from the sale of Stonesthrow were given to Florence. Upon this representation, Hall advised petitioner that he was not required to file a Federal income tax return for 1953. Petitioner fraudulently failed to file a Federal income tax return for the year 1953 with intent to evade taxes. 1954 Respondent determined, and in his second amended answer alleged, that petitioner had taxable income in the amount of $47,539.58 in the year 1954. Respondent computed petitioner's adjusted gross income and taxable income as *220 follows: Income from the sale of: Kia-Ora Apartments
$30,200.00
Contract to purchase Windsor
Hotel
9,990.00
Bowman Heights Lots
12,349.58
$52,539.58
Less: Legal fees
3,400.00
Adjusted Gross Income
$49,139.58
Less: Standard Deduction
$1,000.00
Exemption
600.00
1,600.00
Correct Net Taxable Income
$47,539.58 Petitioner contends that the above items of income were erroneously attributed to him and, in any event, such items of income are overstated and that respondent has failed to allow as deductions items of costs and expenses, with respect to the above transactions. Petitioner instructed his accountant, and has consistently maintained since the investigation of his case began, that certain transactions respondent ascribes to him were actually negotiated by him for his former secretary, Margaret I. Bland, sometimes hereinafter referred to as Margaret, who was his common law wife as early as 1953 and whom he married in a wedding ceremony pursuant to a license on July 2, 1957. Petitioner's accountant prepared a return for Margaret reporting the following schedule D transactions based on information supplied by petitioner. Description
Sales
Cost
Expenses
Gains
Price
Vacant Lot, 47th St. at SW 8th St.
$12,049.58
$11,200.42
$ 849.16
Lot 10-12 B H Ormond Beach
29,750.00
25,400.00
$1,200.00
3,150.00
Net Short-term gains
$3,999.16
*221 The vacant lot on 47th Street will hereinafter be referred to as the "Bowman Heights" lot and the Ormond Beach lots will be referred to as the "Kia-Ora" apartments. Margaret signed various papers pertaining to Benn's 1954 transactions. Benn avoided taking title to property in his own name, preferring to use various aliases, corporations, or Margaret as a shield to conceal his holdings. All of the negotiations with respect to the transactions reported on Margaret's 1954 return were carried on in her name by petitioner, acting in his own behalf but representing himself to be Margaret's agent. He described Margaret to one of his associates as "a $450,000 heiress." Petitioner instructed Margaret to hide herself during the trial of this case, and she did not appear as a witness. In November of 1957 respondent's special agent investigating the income tax liability of petitioner attempted to serve a summons on Margaret by contacting Benn in a motel. Margaret was in the motel but Benn refused to tell the special agent where she was and he did not tell Margaret that the special agent had attempted to serve her with a summons. In December 1953 Benn negotiated with Kenneth G. Allen and his *222 wife for the purchase of a hotel owned by the Allens in Hollywood Beach, Florida, known as the Windsor Hotel. At that time it was the intention of Benn and Morris Glantz that the latter should share in this transaction and that the property should be conveyed to Glantz and Margaret each to hold a 50 percent interest therein with Benn and Glantz sharing equally in paying the purchase price, Margaret to hold her interest for the benefit of Benn. On or about December 24, 1953, the Allens signed a written agreement to sell the hotel to Glantz for $20,000 in cash, $32,000 in promissory notes of Glantz's corporation, Miss Florida, Inc., and the assumption by Glantz of outstanding mortgages payable in the approximate amount of $66,000. This sales agreement also contained an acknowledgment by the Allens of the receipt of $10,000 in cash at the time the agreement was signed. Benn obtained a separate "receipt" from the Allens acknowledging the receipt of $10,000 in cash from Margaret as a binder payment. The Allens did not receive the $10,000 for which the acknowledgment and the receipt were executed. On January 2, 1954, the Allens executed a conveyance of the property to Glantz and Margaret. *223 Although it was originally planned to have Margaret and/or Benn as a co-owner of the hotel, Glantz decided he wanted an exclusive title to it, so he agreed to return to Benn the equivalent of the $10,000 Benn had presumably paid to the Allens and a new deed was executed by the Allens dated January 2, 1954, whereby the property was conveyed to Glantz alone. Respondent allowed petitioner an expenditure of $10 in connection with this payment. When the deal was closed the Allens received $10,000 in cash from Glantz and $32,000 in promissory notes, which notes subsequently proved to be worthless. On or about June 8, 1954, Joseph Pardo, sometimes hereinafter referred to as Pardo, a Miami attorney who was also president of a Florida corporation known as Rachelle Enterprises, Inc., the stock of which was owned by Glantz's wife and daughter but which was controlled by Glantz, signed a deed transferring the Bowman Heights lots to Margaret in satisfaction of Glantz's purported obligation to Benn on account of the moneys which Glantz supposed Benn had advanced in connection with the purchase of the Windsor Hotel. At that time the basis of Margaret and/or Benn in the Bowman Heights lots did *224 not exceed the sum of $10. Thereafter Margaret conveyed the Bowman Heights lots to petitioner's New York corporation, King-Universal Corporation, sometimes hereinafter referred to as King-Universal. On July 12, 1954, King-Universal sold the Bowman Heights lots to a Miami couple known as the McDaniels for $13,750. As a part of the consideration Benn received a 1954 Oldsmobile valued at $3,000 and a 1954 Buick valued at $3,100. The remainder was to be paid in cash. Of the purchase price payable in cash, $1,200.42 was used to settle paving liens and to pay accrual real estate taxes on these lots. The remainder of the cash payment ($6,449.58) was paid to King-Universal which immediately distributed this amount to Margaret for the benefit of Benn. Respondent also verified and allowed an additional expenditure of $200 in connection with these lots. Petitioner realized a profit of $12,339.58 in 1954 from the sale of the Bowman Heights lots. Benn negotiated with and on July 8, 1954, obtained the written agreement of the owners of the Kia-Ora apartments, herein referred to as the Riesens, [1] to sell their right, title, interest, and equity therein to 484 South Atlantic Corp., sometimes *225 hereinafter referred to as Atlantic, a dummy corporation completely owned and controlled by Benn although its stock was formally recited to be in the name of Margaret. According to the agreement dated July 8, 1954, the purchaser (Atlantic) was to assume two mortgages not to exceed the total principal amount of $78,000, including a second mortgage to Harry Nadler in the principal amount of $34,000, and to pay $23,500 to various persons holding interests in Kia-Ore as follows: $10,000 by check to be endorsed by the seller to Harry Nadler; $2,000 by check to be endorsed by the sellers to Walter G. and M. Joyce Pudney; $2,000 in cash to the sellers at closing; $4,500 in the form of a nonnegotiable, noninterest-bearing promissory note payable to the sellers on or before January 1, 1955; and $5,000 which the agreement recites had been paid to the sellers on June 29, 1954. Riesen also, by a separate document, acknowledged receipt of $5,000 in currency from Margaret, and Benn delivered Margaret's promissory note to Riesen in the principal amount of $4,500, receipt for which was acknowledged by the Riesens. The Riesens received the $5,000 in currency, but no amount has been paid to them or *226 in their behalf toward satisfaction of the $4,500 note. This note was worthless. Benn never intended that any payment should be made on it and so conducted his affairs as to render it uncollectible. On or about July 22, 1954, Benn delivered a $2,000 cashier's check to the Pudneys' attorney, David L. Black, in payment for their interest in Kia-Ora and received a receipt made out to Margaret in that amount. On the same day Benn paid Black $300 for legal services and gave him an additional $300 for legal services rendered by another attorney in Riesen's behalf. Black gave petitioner receipts for both amounts. Pursuant to an escrow agreement relating to a modification of the second mortgage, Benn delivered two cashier's checks dated July 15, 1954, in the amounts of $10,000 and $1,150 to the escrow agents. On July 22, 1954, a release was delivered to the escrow agents authorizing these amounts to be paid to the attorney representing Nadler, the holder of the *227 second mortgage on Kia-Ora. Respondent, in his statutory notice, allowed petitioner to deduct $3,400 for "Legal fees" paid. This includes the two $300 items above referred to. In April of 1952 Edward Wharton, sometimes hereinafter referred to as Wharton, had acquired an undisclosed one-third interest in the Kia-Ora apartments, then under construction, for $15,000 which he paid to the Riesens, pursuant to a written but unrecorded agreement signed by him and the Riesens. Sometime in 1954, at Riesen's request, Wharton met Benn in New York and, based upon representations made by Benn and Riesen, Wharton signed numerous documents and receipts containing false recitals pertaining to the Kia-Ora transaction. Again in 1959, after Riesen's death, Wharton met Benn and Silver in a New York restaurant and, as a result of Benn's promise to recover Wharton's $15,000 investment in Kia-Ora, Wharton signed, before a notary public, a false document acknowledging receipt of a promissory note in the amount of $4,500 in July 1954 and further acknowledging receipt of $4,500 cash from Benn in payment of this note in October 1954. Wharton has not received any amount from petitioner or any person represented *228 by petitioner as a result of the Kia-Ora transaction. On July 19, 1954, 3 days after Atlantic took possession of Kia-Ora, Benn negotiated the exchange of its capital stock for the capital stock of Inversiones en Bienes Raices, S. A., sometimes hereinafter referred to as Inversiones, a Mexican corporation, the stock of which was owned by two brothers, John Weesner and R. Paul Weesner, the latter of whom is sometimes hereinafter referred to as Weesner and who acted on behalf of himself and his brother. The exchange was based upon equity values, and because a mortgage on Kia-Ora turned out to be $5,000 less than anticipated Weesner owed Benn $5,000 which debt was acknowledged by the execution of a promissory note in the amount of $5,000, payable to Margaret. On or about October 7, 1954, Benn accepted Weesner's check in the amount of $4,500, payable to Margaret, in full satisfaction of the $5,000 note. This check, endorsed by Margaret and Weesner, was cashed and Benn received the proceeds. In June 1959 Weesner signed a letter addressed to and dictated by petitioner containing the false recital that the $4,500 he paid petitioner was given in repayment of a loan. After the exchange of *229 stock occurred, Manuel G. Escobedo, a Mexican attorney, sometimes hereinafter referred to as Escobedo, held the Inversiones stock in trust for Margaret, as nominee of Benn, in order to circumvent a law of Mexico restricting the ownership of certain property to Mexican Nationals. Shortly before the exchange occurred, Inversiones had foreclosed a mortgage it held on a hotel known as the Casa Miranda in Acapulco, Mexico, which was owned by another Mexican corporation known as Inmuebles Turismo, S. A., sometimes hereinafter referred to as Inmuebles. All of the capital stock of Inmuebles was held by Alfred J. Miranda, Jr., sometimes hereinafter referred to as Miranda. By an agreement dated September 14, 1954, Inmuebles and Miranda acknowledged Inversiones to be the owner of the Casa Miranda, and Benn, acting for Inversiones, granted Inmuebles and Miranda an option to purchase the stock of Inversiones for $57,454.36. [2] On October 22, 1954, Benn received, on behalf of Inversiones, a check from Miranda dated October 21, 1954, in the amount of $40,000 as partial payment of the option price. Benn used this check to purchase 16 cashier's checks for $2,500 each, payable to himself, which he *230 subsequently cashed. On or about October 28, 1954, petitioner delivered to Miranda the 1954 Oldsmobile valued at $3,000 which he had received from the McDaniels as a part of the Bowman Heights transaction. Thereafter, Miranda acknowledged that Inmuebles was indebted to Inversiones in the total amount of $27,000, payable in three annual installments beginning December 1, 1956, with interest at 10 percent per annum. The $27,000 amount is composed of the remaining $17,454.36 to be paid on the option price, the $3,000 automobile, and allegedly $6,545.64 in cash given to Inmuebles or Miranda by Benn. Petitioner contends that the $3,000 automobile and $6,545.64 cash advancement are items of costs and expenses incurred by him with respect to this transaction. The $3,000 automobile was sold by Benn to Miranda as part of the deal, and Miranda subsequently acknowledged that he was indebted to petitioner in the amount of $3,000. Benn advanced only $545.64 in cash to Miranda and not $6,545.64 which appears *231 on a letter of acknowledgment prepared by Benn and signed by Miranda. The sum of $6,000 resulted from an agreed reduction in the interest rate on the original indebtedness of Inmuebles to Inversiones. The balance of $21,000 ($17,454.36 owed on the option, $3,000 Oldsmobile, and $545.64 cash) was discharged by Inmuebles on or before June 18, 1957. Respondent has conceded that petitioner is entitled to a deduction for the $545.64 advanced to Miranda. Benn paid Silver $707 to cover the expense of Silver's trips to Mexico City in September 1954. Benn and Margaret made five trips from Miami to Mexico during the year 1954, incurring expenses of at least $1,200. Both of these amounts were business expenses directly connected with the Inversiones transactions. As hereinbefore found by us Benn repaid to Glantz the sum of $8,000 on account of his failure to prosecute the Jacques Miller claim. Petitioner's receipts for the year 1954 amounted to $58,250 and his expenses and items of cost for the same year amounted to $35,413.06. His adjusted gross income for the year 1954 amounted to $22,836.94. Petitioner did not file a Federal income tax return in his own name for the year 1954 nor did *232 he file a declaration or make any payments on his estimated tax for the year 1954. Petitioner's failure to file a Federal income tax return for the year 1954 is due to fraud with intent to evade payment of Federal income taxes. 1955 On his Federal income tax return for the year 1955 Benn reported the following schedule D transactions: Property
Acquired
Date Sold
Selling Price
Cost
10,000 Fla. Keys Gas. Corp.
3-14-55
12-31
$319,233.90
$332,978.03
200 Woodland Park Corp.
2- 8-55
10- 8
108,000.00
17,829.49
Expense of Sale
Gain or Loss
10,000 Fla. Keys Gas Corp.
$7,145.50
($20,889.63)
200 Woodland Park Corp.
90,170.51
Net Long-Term Gain
$69,280.88
On Schedule C Benn claimed a business loss in the amount of $8,000, which he indicated on his return to be an amount paid to settle a lawsuit brought against him by a man named Dellaquila. Respondent determined that petitioner's taxable income for 1955 was $247,370.90, computed as follows: Received on Myers-Garfield Option to purchase gas
$ 12,900.00
business
Received on Weisner [Weesner] Option to purchase gas
12,500.00
business
Received from sale of Upper Keys properties at
58,333.00
Marathon and Tavernier
Received from sale of Key West properties to F.K.G.
248,000.00
Co., Inc.
Gross Receipts
$331,733.90
Less: Cost of foregoing and expenses
82,763.80
Adjusted Gross Income
$248,970.90
Less: Standard Deduction
$1,000.00
Exemption
600.00
1,600.00
Correct Net Taxable Income
$247,370.90
*233 The only disputed item of gross receipts is that of $12,500 which respondent determined was "Received on Weisner Option to purchase gas business." The principal issue presented for our resolution for this taxable year is the correct amount of petitioner's costs and expenses with respect to the properties which Benn bought and sold. Most of petitioner's alleged income and expenses for the year 1955 resulted from or were closely connected with his acquisition and sale of the assets of the Key West Propane Gas Corporation, sometimes hereinafter referred to as Propane. The first of an involved series of transactions occurred on February 8, 1955, when Benn purchased from Albert E. Peirce and his wife the capital stock of The Argus Corporation, Woodland Park Corporation, Propane, and Propane's subsidiaries, namely, Key West Gas Co., Island City Gas Company, Keys Propane Corporation, and Marathon Gas Company. The stock of all these corporations was acquired for $7,500. As of that date Propane's assets were encumbered by four mortgages in this order: Mortgage bonds held by The Pennsylvania Company for Banking and Trusts of approximately $152,000; a mortgage to Woodland Park Corporation, *234 sometimes hereinafter referred to as Woodland, securing a principal indebtedness plus accumulated interest of approximately $100,000; [3] a mortgage to Julius F. Stone, Jr., sometimes hereinafter referred to as Stone, for approximately $110,000; and a mortgage to Louis Cellucci, sometimes hereinafter referred to a Cellucci, securing a debt with a balance of approximately $12,500. In December 1954 an involuntary bankruptcy proceeding had been filed against Propane which Benn opposed. He testified for more than 4 hours to avoid an adjudication of bankruptcy. This bankruptcy proceeding was dismissed but at some later time prior to March 1955, and after Benn had acquired its stock from the Peirces, and had reached an understanding with certain creditors, hereinafter described in more detail, Propane was adjudicated a bankrupt in a second bankruptcy proceeding. Its assets and those of its *235 subsidiaries were put up for public sale on March 14, 1955. Benn's wholly owned corporation, King-Universal, submitted the highest bid, and on March 18, 1955, the District Court for the Southern District of Florida confirmed the sale to King-Universal for $6,000. This money was supplied by Benn. King-Universal held these assets only temporarily and then transferred them to The Florida Keys Gas Corporation, sometimes hereinafter referred to as FKG, [4] a newly formed Florida corporation owned by Benn. All of the transactions connected with the purchase and sale of stock or assets of Propane and its subsidiaries were individual transactions of Benn. FKG was a mere nominee or conduit corporation and Benn reported the alleged gain or loss resulting from these transactions in his 1955 individual income tax return. *236 On or about April 1, 1955, Benn received the amount of $12,900 from Miami Gas Co. in consideration for an option to purchase the assets of FKG. This option was not exercised, however, but on or about July 22, 1955, Benn received a net amount of $58,333.90 on the sale of a portion of Propane's assets known as the Upper Keys properties to the same interests. FKG, acting through Benn and Stone (who was a Key West attorney), operated the Propane assets until they were sold, during which period Benn advanced money for costs and expenses. The following is a summary of the costs and expenses claimed by petitioner on his 1955 return and those allowed by respondent: Item
Claimed
Allowed
Purchase of stock in Wood-
land
$ 7,500
$ 7,500
Payment for Propane's as-
sets at bankruptcy sale
6,000
6,000
Payments to Pardo
3,000
3,000
Payments to Resnick and
Landis
2,000
2,000
Payment of legal fee to
Stone
2,000
2,000
Florida Payroll tax - third
quarter
864.73
864.73
FICA tax - third quarter
4,070.84
4,070.84
Federal unemployment tax
- 1955
200.90
200.90
Accountant's fees, David W.
Hall
3,000.00
3,000.00
Advances to Woodland
2,835.91
2,835.91
Payment to Julius Fried-
man
2,200.00
1,550.00
Payment to Delta Tank Co.
1,500.00
1,500.00
Advances to Stone for FKG[1]
18,285.00
28,339.24
Interest Payments
4,625.88
4,455.88
Legal fees - Sally Roman
and Smith
3,500.00
4,300.00
Discount FKG Co. notes
2,000.00
2,700.00
Consultation fee - Peirces
1,200.00
1,550.00
Purchase office furniture
500.00
500.00
Miscellaneous
645.50
646.30
Total
$65,928.76
$77,013.80
*237 Respondent disallowed certain other items of cost and expense totaling $24,147.69 and claimed by petitioner on his 1955 income tax return, but he does not rely upon these items as proof of fraud. The following schedule summarizes the amounts claimed by petitioner and the amounts we have found, after careful consideration of the evidence presented, to be sufficiently substantiated and directly connected with petitioner's business activities as to be deductible during the taxable year: Allow-
Item
Claimed
able
Personal Auto Expense
$ 1,000.00
Telephone Expense
6,065.44
$3,417.88
Air Travel
5,480.18
1,776.83
Auto Rental
1,522.70
1,232.74
Hotel Rooms
2,509.37
296.98
Expense of sale of FKG
assets
7,145.50
[1]
Other Expenses
424.50
Total
$24,147.69
$6,724.43
Respondent alleged that petitioner's failure to return his correct net taxable income was "due to *238 fraud on the part of the petitioner with willful intent to evade the payment of federal income taxes." As proof of the alleged fraud, respondent relies upon petitioner's claiming the following expenses, beyond the extent allowed by respondent, as deductions from his income in the year 1955: Item
Claimed
Allowed
Payment of Cellucci Mort-
gage
$ 12,500.00
Payment of second mort-
gage (Stone)
111,176.48
Payment of Thunderbird
Claim
31,200.00
$5,000.00
Payment of Commission to
Suriani
2,500.00
750.00
Legal Fee - Robert Theed
2,500.00
Total
$159,876.48
$5,750.00
By an amendment to his second amended answer respondent affirmatively alleged that "petitioner with willful intent to evade the payment of federal income tax, claimed a loss [in 1955] from 'business or profession' in the amount of $8,000. In truth and in fact, and as the petitioner well knew, he did not sustain the claimed business loss but deducted such fictitious loss for the purpose of evading the payment of federal income taxes." The claimed business loss arose from a transaction begun in 1947, at which time petitioner and three other persons, including Dellaquila, agreed to construct *239 a motel in Miami. Some preliminary work was done on the motel site, but the owner of the land, which was leased to Benn's associates, disapproved of one of them and refused to subordinate his land to a mortgage. The project was not carried out and Dellaquila, who advanced $8,000 toward the costs of the project, sought reimbursement from petitioner. Benn agreed to take over Dellaquila's interest in the venture and he acknowledged indebtedness to Dellaquila in a letter and promissory note in the amount of $8,000 plus interest. On his 1955 tax return the petitioner claimed a loss of $8,000 paid to Dellaquila in compromise of a judgment against Benn in favor of Dellaquila. There is no evidence in the record before us that Benn ever paid the sum of $8,000 or any other amount to Dellaquila. Petitioner did not sustain a loss from his business or profession in the amount of $8,000 in 1955. Respondent has not carried his burden of proof that the claimed loss on Benn's return was for the purpose of evading the payment of Federal income taxes. The crucial facts from which the question of fraud for the year 1955 must be determined are as follows: After the aforementioned sale of the Upper *240 Keys properties to the Miami Gas Co. interests Benn retained, sometime in early 1955, a real estate broker named George M. Suriani, sometimes hereinafter referred to as Suriani, to sell the remaining Propane assets referred to as Lower Keys properties. Suriani and a broker in Houston, Texas, agreed that they would share equally in any commission either of them derived from the sale. The Houston broker, unknown to Suriani, first interested the Texas Natural Gas Corporation of Tulsa, Oklahoma, in the Propane assets, and on September 21, 1955, a wholly owned subsidiary of that firm, known as the Florida Keys Gas Co., Inc., purchased the assets for a gross sales price of $400,000, of which $152,000 represented the assumption by the purchaser of the $152,000 mortgage in favor of The Pennsylvania Company for Banking and Trusts. Benn, on behalf of FKG and himself, warranted that the property sold was encumbered by no other mortgage, except one encumbering certain automotive equipment in a small amount and not pertinent to this case. The net sales price of $248,000 was paid to Benn in the form of a bank draft for $100,000 and $148,000 in the form of five promissory notes in the face amount *241 of $29,600 each. Benn converted the $100,000 draft to cash on September 23, 1955. Three of the promissory notes were used by Benn to satisfy the outstanding balance of a bank loan to him in the amount of $87,000. The other two notes were converted to cash during October and November 1955. The total discount on the five notes was $2,700. On September 26, 1955, Benn telephoned Suriani and invited him to accompany Benn to Key West the following morning. Suriani agreed and en route Benn offered him $250 if he would agree to acknowledge receipt of a broker's commission in the amount of $2,500. Suriani pointed out that the income tax on $2,500 would be greater than the amount he was to receive, whereupon Benn offered him the further sum of $500 to cover any tax liability incurred as a result of such an acknowledgment. Suriani then agreed to the arrangement, and Benn procured a cashier's check dated September 27, 1955, in the amount of $2,500 payable to Suriani. On the back of the check Benn inserted a recital to the effect that Suriani was sole broker on the sale of the remaining Propane assets and, at Benn's request, Suriani endorsed the check beneath this recital. Benn then cashed the *242 check and paid Suriani $750. Suriani also signed a general release and a brokerage agreement which was prepared in Stone's office and witnessed by Stone and his secretary. The release included a receipt for $2,500 in the form of a cashier's check. Benn did not pay to Suriani any amount in excess of $750 in the year 1955. Petitioner's claimed deduction in the amount of $2,500 on account of an alleged payment to Suriani in this amount was due to fraud with intent to evade payment of Federal income taxes. Sometime in the year 1955 Benn paid an attorney named Robert Theed, sometimes hereinafter referred to as Theed, $5,000 on behalf of Paul Q. Adams and his wife, sometimes hereinafter referred to as the Adamses. Prior to that payment he had made two other payments in 1955 totaling $1,000. These payments were connected with certain notes issued or guaranteed by Propane at the time it was owned by the Peirces during or prior to 1952. The Peirces had acquired the ice plant in Key West from Glantz and Benn's brother, Louis, and as a part of the consideration they caused Propane to issue $75,000 in notes, part of which were payable to Glantz and part of which were payable to Louis. In 1953 *243 petitioner agreed to pay the Adamses $27,500 for an interest in a rest home owned by the Adamses known as the Hialeah Health Center, which amount was paid in the form of certain of the Propane notes which were endorsed without recourse to the Adamses by Louis and Glantz. Theed held these notes as trustee for the Adamses and their corporation, Thunderbird Construction Company. At the time of the bankruptcy proceeding against Propane, Benn was interested in so controlling the Propane notes as to prevent their use in the bankruptcy proceeding by creditor interests adverse to Benn. In order to accomplish this he orally assured Theed and Adams that he would guarantee payment of these notes. These notes are herein referred to as the Thunderbird claims. After the bankruptcy of Propane and based upon various representations made by Benn, Theed signed false receipts on two occasions acknowledging receipt from Benn of $31,200 in currency in full payment of all amounts due the Adamses on the Propane notes. Paul Adams, subsequent to December 31, 1955, signed, at Benn's request, a series of receipts bearing various dates in 1955 acknowledging receipt of various sums of money from Theed in connection *244 with the Propane notes. Actually Adams received only $500 at the time the receipts were signed. All of the other receipts were fictitious. Theed received legal fees from Benn in the year 1955 totaling $3,700. Prior to Theed's appearance in 1957 to give testimony before the Internal Revenue Service's special agent investigating the case, Benn met with Theed and agreed to deliver the mortgage note of Propane running to Cellucci, to which we have already referred, for which Benn would receive a $10,000 credit toward his liability on the Thunderbird claims, to Theed in exchange for Theed's false testimony before the special agent. After his testimony was concluded, Theed went to Pardo's office and received Pardo's check for $8,000 in lieu of the Cellucci note. At that time Pardo dictated a letter indicating that the amount of $8,000 was a loan. Theed signed a receipt for the check at the foot of the letter and returned the Cellucci note to Pardo. Thereafter, Theed cashed the check and delivered the $8,000 to his client Adams sometime in April 1957. Petitioner's total costs and expenses incurred in the year 1955 with respect to the Thunderbird claims was $9,700 of which $5,000 was allowed *245 by respondent. Petitioner's claimed deduction in the amount of $31,200 allegedly in satisfaction of the Thunderbird claims was due to fraud with intent to evade payment of Federal income taxes. Respondent determined that Benn did not satisfy a second mortgage in the amount of $110,000 on Propane's assets, which was held by Stone as trustee for himself and several of his clients. On or about March 25, 1955, Stone assigned this mortgage to Villa Hermosa Corporation, sometimes hereinafter referred to as Villa, in exchange for that corporation's unsecured promissory note in the amount of $110,000. Villa was a dummy corporation organized and controlled by Benn. A satisfaction of this mortgage was executed by Villa on September 20, 1955, and was recorded on September 23, 1955. Prior to August 6, 1955, Benn paid Stone in consideration for his transfer of this mortgage to Villa the sum of $34,157 in currency and on or about October 8, 1955, the sum of $77,000 in currency. Also, on or about October 8, 1955, Benn caused another of his dummy corporations, Capital Investors Co., Inc., to transfer to Stone the Woodland stock which Benn had acquired from the Peirces. [5]Woodland's assets were *246 a second mortgage on the assets of Propane, to which we have already referred, and a mortgage on an apartment house in Hartford, Connecticut, securing an obligation in the approximate amount of $80,000. This latter mortgage had been pledged as additional security for the bonds secured by the first mortgage on the property of Propane and consequently neither it nor the interest payable thereon was available to Woodland. On or about October 8, 1955, the second mortgage on Propane's assets was eliminated in the following manner: FKG purported to pay $108,000 to Woodland in satisfaction of this mortgage, Woodland purported to lend $108,000 to Stone, and Stone purported to pay to Benn or his dummy corporation, Capital Investors Co., Inc., $108,000 as purported payment for the Woodland stock. In truth and in fact no money changed hands in any form, the transactions were entirely "paper transactions," and the receipts and documents executed in connection therewith were false. *247 Petitioner in his 1955 return reported the "proceeds" of the "sale" of the Woodland stock as income in the amount of $108,000 and included the same amount in his cost of "10,000 Fla. Keys Gas Corp." Petitioner received no income and is entitled to no deduction on account of this purported transaction. Benn included among his costs and expenses of FKG the alleged payment of $12,500 in satisfaction of a fourth mortgage held by Cellucci against the assets of Propane. Respondent contends that Benn never paid the sum of $12,500 to Cellucci and that the claimed deduction for $12,500 was due to fraud with intent to evade Federal income taxes. On or about March 23, 1955, Benn, assisted by Stone, included Cellucci by false statements to assign this mortgage to Villa and to endorse in blank and deliver to Benn the note secured thereby in exchange for an unsecured note of King-Universal in the amount of $12,500. At the same time Benn and Stone prevailed upon Cellucci by false statements to sign a receipt showing the payment to him of $10,000 in cash. No payment was made to him. Villa executed a satisfaction of this mortgage on September 20, 1955, which was recorded on September 23, 1955. *248 In 1956 Benn transferred the stock of King-Universal to Theed in anticipation of a suit being brought by Cellucci on this note. At that time the assets of King-Universal amounted to only about $2,000, which it was understood Theed was to pay to himself for legal services in connection with the anticipated suit. Benn did not intend that any payment should be made on the King-Universal note and took steps to prevent any collection thereon. Petitioner did not incur the alleged expense of $12,500 and the claimed deduction in 1955 for payment of the mortgage held by Cellucci was due to fraud with intent to evade payment of Federal income taxes. Respondent determined that petitioner received $12,500 from Weesner and his brother by granting an option to them on or about April 16, 1955, to purchase Propane's assets from one of Benn's corporations known as BOAM Corporation. Benn did not include the sum of $12,500 in his gross income for the year 1955 and respondent contends that such omission was due to fraud with intent to evade payment of Federal income taxes. The Weesners did not or were unable to exercise their option and demanded that their $12,500 be returned. They brought suit for *249 its recovery against Benn, BOAM Corporation, and others. Benn filed a counter-claim invoking various claims connected with the Inversiones and Inuebles transactions in Mexico. Although Weesner believed that Benn's claims were not well founded, he could find no visible assets owned by Benn upon which he could execute any judgment he might receive, so he "decided to wash out the entire matter" and make a settlement. He and Benn exchanged general releases and "forgot the entire matter." The complaint and counter-claim were dismissed and settlement made on the understanding that the $12,500 would be used to pay off certain obligations owed by Weesner in Mexico. The obligations were paid off in 1957 pursuant to the settlement between Benn and the Weesners. The $12,500 received by Benn in 1955 from the Weesners was held by him in a fiduciary capacity and it did not constitute taxable income to him. Petitioner's adjusted gross income for the year 1955 was therefore $113,888.67. A part of the deficiency for the year 1955 is due to fraud with intent to evade the payment of Federal income taxes. Petitioner has not offered any evidence to prove error in respondent's assertion of the addition *250 to tax for underpayment of estimated tax for the year 1955. Ultimate Findings Some part of the deficiency for each of the years 1951 to 1955, inclusive, is due to fraud with intent to evade the payment of taxes. The returns filed by petitioner for the years 1951, 1952, and 1955 were false and fraudulent and were filed with intent to evade payment of taxes. The assessment and collection of the deficiencies and additions to tax for the years 1951 and 1952 are not barred by the statute of limitations. Petitioner fraudulently failed to file Federal income tax returns for the years 1953 and 1954 with willful intent to evade taxes. Inasmuch as a part of the deficiency for each of the years 1951 to 1955, inclusive, is due to fraud with intent to evade tax, respondent properly determined that petitioner is liable for additions to tax pursuant to section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954. Petitioner has not shown that his failure to file a Federal income tax return for the year 1953 was due to reasonable cause and not due to willful neglect. Therefore, respondent properly determined that *251 petitioner is liable for the addition to tax for this year pursuant to section 291(a) of the Internal Revenue Code of 1939. Petitioner failed to make and file declarations of estimated tax for the years 1953 and 1954 within the time prescribed by law and therefore respondent properly imposed the additions to tax pursuant to section 294(d)(1)(A) of the Internal Revenue Code of 1939. Petitioner underpaid his estimated tax for the year 1955 and therefore respondent properly imposed the addition to tax for this year pursuant to section 6654(a) of the Internal Revenue Code of 1954. Opinion KERN, Judge: The transcript of the oral testimony given in the trial of this case exceeds 1,800 pages in length and over 230 exhibits were introduced in evidence at the trial. Thirty-nine witnesses testified. By a careful reading and rereading of the record herein, our memory has been vividly refreshed with regard to the evidence adduced, to the witnesses who testified (many of whom were rather extraordinary characters), and to the demeanor of these witnesses on the witness stand and their manner in giving testimony. Most of the transactions involved herein were complex. *252 The complexity of many of them was, in our opinion, due to the manner of doing business deliberately chosen by petitioner for the purpose, inter alia, of defrauding those with whom he did business (several of whom were themselves not above duplicity) and also the Internal Revenue Service. The unraveling of these complexities was made more difficult by reason of the fact that with regard to many transactions the testimony of witnesses was in conflict with the testimony of other witnesses. Indeed, in many instances, the testimony of a witness was in conflict with receipts and other documents signed by the same witness, occasionally when purportedly under oath, at prior times. Some of the witnesses impressed us as being guileless and gullible, and some as being both gullible and unscrupulous. In either case many of them fell victims to petitioner's charm and glibness (assisted in some instances, by their own cupidity). In the face of these difficulties we have done our best to resolve the troublesome questions of fact presented in this case, and our conclusions as to these questions are set out in our Findings of Fact. Since most of the issues in this case are factual in character, *253 they are disposed of by our Findings. In our opinion, it would serve no useful purpose to repeat them in this Opinion or to discuss the mass of evidence on which they are based. However, we do feel that it is advisable to discuss briefly a few matters which present mixed questions of fact and law. During the years involved herein petitioner was engaged in the business of acquiring and disposing of real and personal property. The purchase price of this property was frequently "paid" partly in cash and partly in petitioner's unsecured promissory notes. He maintained no business office or permanent place of residence. He avoided holding title to property in his own name for any extended period, preferring to immediately dispose of the property, or to have it held in the name of one of his "dummy" corporations or that of Margaret I. Bland. From the attendant circumstances and petitioner's conduct, we have concluded that he affirmatively took steps to impede the collection of his obligations and that he had no intention of honoring certain of the promissory notes for which he acquired property at their maturity or at any other time. While petitioner might have been in theory legally *254 liable on these notes, there appeared to be little likelihood that he would ever pay or could be required to pay them. Accordingly, in computing petitioner's cost and expenses with regard to certain of the properties sold by him during these years, we have included these notes only to the extent of their fair market value, which was zero. In giving these notes to the sellers of those properties petitioner has given nothing substantially equivalent to cash, and he is not, as a cash-basis taxpayer, to be permitted to deduct as costs or include in his basis any amount for these notes until such time as they are actually paid. Eckert v. Burnet, 283 U.S. 140; Helvering v. Price, 309 U.S. 409; Baltimore Dairy Lunch v. United States, 231 F. 2d 870; Quinn v. Commissioner, 111 F. 2d 372; Skaneateles Paper Co., 29 B.T.A. 150; and Lloyd H. Redford, 28 T.C. 773. In those instances where petitioner borrowed money on his notes executed to third parties and paid the cash proceeds to defray costs and expenses directly to the owner of the property, we have included such payments as part of his basis notwithstanding *255 the nonpayment or uncollectibility of such notes. Edward W. Edwards, 19 T.C. 275. The property sold by petitioner was not held for investment purposes, Rollingwood Corp. v. Commissioner, 190 F. 2d 263, affirming a Memorandum Opinion of this Court, and it is apparent from the record presented herein that petitioner's modus operandi dictated the immediate sale of property held or acquired by him to customers in the ordinary course of his business. Accordingly, petitioner is not entitled to capital gains treatment on any of the sales in the years involved herein. See Paul K. Ashby, 37 T.C. 92; Estate of Eugene Merrick Webb, 30 T.C. 1202; J. Roland Brady, 25 T.C. 682. Pursuant to the same reasoning, we have also concluded that the loss carryover from 1950 was not a capital loss carryover but was an operating loss carryover. Respondent contends that a substantial portion of the deficiencies determined for each of the years in issue resulted from petitioner's fraudulent efforts to evade payment of his correct income tax liabilities. For the years 1951 and 1952, which petitioner contends are closed by the statute *256 of limitations, the burden is on respondent to prove by clear and convincing evidence that petitioner filed for those years false and fraudulent returns with intent to evade tax. For the years 1961 through 1955, respondent must establish by clear and convincing evidence that some part of the deficiencies determined was due to fraud with intent to evade tax. The fact that for these years the burden of proof with respect to fraud is upon respondent does not relieve the petitioner of his burden of overcoming the presumption of the correctness of the deficiencies in tax for these years as determined by the respondent. See Snell Isle, Inc., v. Commissioner, 90 F. 2d 481, affirming a Memorandum Opinion of this Court, certiorari denied 302 U.S. 734. In our opinion the respondent has more than borne the burden of proof imposed upon him with regard to fraud issues, for all of the taxable years, although we have also found that petitioner's understatements of income for the taxable years were in amounts less than those either determined or alleged by respondent. We have *257 found as a fact that petitioner failed to report a part of his income in each of the taxable years involved herein, that some part of each deficiency was due to fraud with intent to evade tax, and that for the years 1951 and 1952 petitioner's returns were false and fraudulent with intent to evade tax, and that petitioner failed to file returns for the years 1953 and 1954. Accordingly, the statute of limitations does not bar the assessment and collection of the deficiencies or additions to tax for the years 1951 and 1952. Since we have found that a part of each deficiency for the taxable years was due to fraud with intent to evade tax, respondent has properly asserted additions to tax pursuant to section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954 for each of the taxable years. We have found that petitioner failed to file a Federal income tax return for the year 1953 and petitioner has not shown such failure was due to reasonable cause and not due to willful neglect. Therefore, respondent has properly asserted an addition to tax for this year pursuant to section 291(a) of the Internal Revenue Code of 1939. *258 Petitioner did not file declarations of estimated tax for the years 1953 and 1954 within the time prescribed by law, and therefore respondent properly imposed the additions to tax pursuant to section 294(d)(1)(A) of the Internal Revenue Code of 1939. Petitioner has not shown error in respondent's determination that he underpaid his estimated tax for the year 1955, and therefore respondent properly imposed the addition to tax for this year pursuant to section 6654(a) of the Internal Revenue Code of 1954. Decision will be entered under Rule 50. Footnotes
1. The spelling of this name varies as "Reisen" or "Riesen" in the exhibits presented by the parties. It would appear, however, that the "Reisen" version is incorrect because it appears on documents of questionable validity.↩
2. In the option agreement the price was $718,179.55 Mexican pesos and, in terms of American dollars, using an exchange rate of one peso equals $.08, the price was roughly $57,454.36.↩
3. In exhibit 20T the principal amount of this mortgage is stated to be $91,656.76. In respondent's brief the amount of the mortgage plus interest is stated to be approximately $100,000. Petitioner contends the correct amount is $108,000, although his testimony indicated it was "$99,900-some odd."↩
4. This corporation is not the same corporation referred to in the record as FKG Company, Inc. The parties stipulated that Florida Keys Gas Corporation was a mere nominee or conduit corporation of petitioner, while FKG Company, Inc. or Florida Keys Gas Co., Inc. was the company to which petitioner subsequently sold a part of the assets he acquired from Propane, known as the Lower Keys.↩
1. This amount is the result of stating separately certain allowances included in a single figure of $23,685 in the stipulation.↩
1. As petitioner states on brief, all or some part of this item may have been included in those sums allowed by respondent as deductions in 1955.↩
5. The record does not disclose how Capital Investors Co., Inc., acquired this stock. Benn testified that it held the stock for him. It appears that its only purpose was to prevent property from being or continuing to be held for any length of time in Benn's name.↩